Downstate at Lich Holding Co., Inc. v Fortis Prop. Group, LLC (2024 NY Slip Op 50376(U))

[*1]

Downstate at Lich Holding Co., Inc. v Fortis Prop. Group, LLC

2024 NY Slip Op 50376(U)

Decided on April 5, 2024

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 5, 2024
Supreme Court, Albany County

Downstate at Lich Holding Company, Inc., Plaintiff,

against
Fortis Property Group, LLC, Defendant.
FORTIS PROPERTY GROUP, LLC and FPG COBBLE HILL ACQUISITIONS, LLC, Counterclaim Plaintiffs,
against
DOWNSTATE AT LICH HOLDING COMPANY, INC., Counterclaim Defendant, and NYU HOSPITALS CENTER, Counterclaim Defendant.

Index No. 907530-23

Proskauer Rose LLP
Attorneys for Downstate at LICH Holding Company, Inc.
(Peter J.W. Sherwin, Lee Popkin and Adam Farbiarz, of counsel)
Eleven Times Square
New York, New York 10036
Boies Schiller Flexner LLP Attorneys for Fortis Property Group, LLC and FPG Cobble Hill Acquisitions, LLC
(George F. Carpinello and Jenna C. Smith, of counsel)
30 South Pearl Street, 11th Floor
Albany, New York 12207
Becker, Glynn, Muffly, Chassin & Hosinski LLP
Attorneys for NYU Langone Hospitals (formerly known as NYU Hospitals Center)
(Richard N. Chassin, Zeb Landsman, Paula Eppinghaus and Kevin Lin, of counsel)
299 Park Avenue, 16th Floor
New York, New York 10171

Richard M. Platkin, J.

Plaintiff/counterclaim defendant Downstate at LICH Holding Company, Inc. ("Downstate at LICH") moves for: (1) dismissal of the counterclaims alleged by defendant/counterclaim plaintiff Fortis Property Group, LLC ("Fortis"); and (2) summary judgment on its sole cause of action, which seeks to enforce an $8 million commercial guarantee against Fortis (see NYSCEF Doc No. 1 ["Complaint"]). Fortis opposes the motions and cross-moves for the summary dismissal of the Complaint.
Fortis and its affiliate, counterclaim plaintiff FPG Cobble Hill Acquisitions, LLC ("Cobble Hill"), move for leave to amend their corrected Verified Answer and Amended Counterclaims (see NYSCEF Doc No. 80 ["VAC"]) to plead, as an additional affirmative defense, that the guarantee did not become effective due to the failure of a condition precedent. The motion to amend is unopposed.
Counterclaim defendant NYU Hospitals Center ("NYUHC") moves, pre-answer, to dismiss the counterclaims alleged against it by Fortis and Cobble Hill.
BACKGROUND
A. The Parties
Downstate at LICH is a not-for-profit corporation affiliated with the State University of New York ("SUNY") (see Complaint, ¶ 2).
Fortis is a real-estate investment, operating, management and development company with its principal place of business in New York (see VAC, Amended Counterclaims ["ACC"], ¶ 9). Cobble Hill is an affiliate of Fortis (see id., ¶ 10). 
NYUHC, now known as NYU Langone Hospitals, is a not-for-profit corporation affiliated with New York University (see id., ¶ 12). 
B. Downstate at LICH's Complaint
Downstate at LICH entered into a First Amended and Restated Purchase and Sale Agreement ("PSA") with Fortis, Cobble Hill and NYUHC, effective as of June 30, 2014 (see Complaint, ¶ 7; NYSCEF Doc No. 2 [PSA]). Under the PSA, Downstate at LICH ("Seller") agreed to sell, and Cobble Hill ("Purchaser") agreed to purchase, "a group of premises" for the total sum of $240 million, with the closing to occur "in three stages" (Complaint, ¶ 8).
First, there would be an "Initial Closing," at which Purchaser would pay $120 million to Seller, less one-half of the $24 million down payment and other specified adjustments, and receive title to the parcels described as the "Initial Closing Premises" (id., ¶ 9; PSA, §§ 1.1, 2.1). 
Next, there would be a closing as to the "New Medical Site," which is referred to as the "NMS Closing" (PSA, § 4.1 [b]). The conveyance of the New Medical Site to Purchaser was made subject to Purchaser's obligation to re-convey the premises to NYUHC to construct a "New Medical Building" (Complaint, ¶ 9; see PSA, §§ 1.1 [a], 1.3 [a], 15.1 [b]). 
The PSA then called for a "Final Closing," at which Purchaser would pay Seller the remaining balance of funds due and receive title to the remaining two premises, referred to as the "Final Closing Premises" (Complaint, ¶ 9; see PSA, §§ 1.1, 2.1).
"In order to secure Purchaser's obligation to acquire the Final Closing Premises, Fortis agreed to deliver to Seller at the Initial Closing a guarantee to pay Seller $3 million if Purchaser defaults in its obligation to acquire the Final Closing Premises, which amount is in addition to Seller's right to retain the downpayment" (Complaint, ¶ 10).
"As the Initial Closing approached, Seller, Purchaser, and Fortis agreed that $22 million of the downpayment could be used in the Initial Closing, rather than $12 million. This reduction in the remaining downpayment, however, would be offset by a further $5 million downpayment to be paid by Purchaser within six months, payment of which Fortis would guarantee, and by increasing the default guarantee from Fortis by $5 million from $3 million to $8 million" (id., ¶ 11; see NYSCEF Doc No. 3 ["Waiver"]). 
The Initial Closing was held on September 1, 2015, and Fortis and Downstate at LICH entered into a guarantee agreement as of such date (see Complaint, ¶ 13; NYSCEF Doc No. 5 ["Guarantee"]). Fortis unconditionally guaranteed the full amount of the "Guaranteed Obligation" ($8 million) "when and if due" pursuant to Sections 2.3 and 14.1 (b) of the PSA and Sections 1 (C) and 1 (D) of the Waiver (Complaint, ¶ 14; see Guarantee, § 1.1), and those sections trigger Fortis's payment obligation "if Purchaser defaults in its obligation to consummate the Final Closing and acquire the Final Closing Premises" (Guarantee at 2; see PSA, §§ 2.3, 14.1 [b]; Waiver, § 1 [C]).
After some back and forth, the parties eventually agreed to a "Final Closing Deadline" of August 8, 2023 (see Complaint, ¶¶ 21-30, 36-37). Under the PSA, "TIME SHALL BE OF THE ESSENCE FOR THE PARTIES TO CONDUCT THE FINAL CLOSING ON OR BEFORE THE FINAL CLOSING DEADLINE" (PSA, § 4.5 [c] [emphasis in original]).
On July 28, 2023, Seller reminded Purchaser of the August 8, 2023 Final Closing Deadline and confirmed that it was ready, willing and able to close (see Complaint, ¶ 39). 
On August 8, 2023, Seller "tendered to Purchaser all of its deliverables with respect to the Final Closing . . . and was ready, willing and able to close," thereby satisfying the "conditions precedent set forth in Section 4.2 (e)" of the PSA "to Purchaser's obligations to consummate the purchase of the Final Closing Premises and pay the Final Amount" (id., ¶ 40). 
However, "Purchaser failed to pay the Final Amount or comply with its other obligations under the PSA" (id., ¶ 41). Instead, Purchaser asserted that: (i) Seller failed to apply closing credits of least $70 million, and as much as $100 million, that allegedly were promised by SUNY officials; and (ii) NYUHC had not vacated the Final Closing Premises in "good order," which was said to be a condition precedent to Purchaser's obligation to close (see id., ¶¶ 42-43; see also NYSCEF Doc No. 34).
On August 9, 2023, Seller notified Purchaser and Fortis that (1) Purchaser was in default of its obligations under the PSA for failing to consummate the Final Closing by August 8, 2023, and (2) Seller was terminating the PSA based on Purchaser's default (see Complaint, ¶¶ 45-46). 
Later the same day, Seller commenced this action to recover $8 million from Fortis under the Guarantee (see id., ¶¶ 48-52).
C. Fortis and Cobble Hill's Counterclaims — "The Rest of the Story"
Fortis and Cobble Hill maintain that this was not the "simple transaction for the sale of certain properties in Brooklyn" portrayed in the Complaint (VAC at 7).
The relevant history is said to date back to 2011, when SUNY and/or Downstate at LICH acquired substantially all of the assets of Long Island College Hospital ("LICH") "in the hope that LICH would act as a satellite hospital for [SUNY's] largest facility, University Hospital of Brooklyn, and provide training opportunities for [SUNY medical] residents" (ACC, ¶ 13).[FN1]
[*2]However, LICH operated at dramatic losses, putting SUNY/Downstate at LICH "in a precarious financial position" and making them "the target of litigation and public outrage" (id., ¶¶ 14-15). 
The SUNY Board of Trustees voted to close LICH in February 2013, "citing its dire financial condition" (id., ¶ 16). The closing was opposed by unions, community groups and others concerned about the impact on "low-income community members" (id., ¶ 17). As a result of lawsuits bought in Supreme Court, Kings County ("Lawsuits") (see id., ¶ 18), SUNY was temporarily enjoined from closing LICH or reducing the level of services (see id., ¶ 20). 
By July 2013, LICH reportedly was operating at a loss of $15 million per month, while SUNY remained embroiled in litigation (see id., ¶ 22). Given the massive losses, SUNY proposed to "cease operating LICH as soon as possible in favor of a new operator" (id., ¶ 23). 
On July 17, 2013, "SUNY issued a Request for Proposals ('RFP') to offer health care services at the LICH campus, or in the community proximate to LICH, consistent with the health care needs of the community, and to purchase the LICH property, plant and equipment" (id., ¶ 24). Fortis was "one of the five bidders who submitted proposals in response to that RFP, and a SUNY committee designated Fortis's proposal as the highest scorer. However, as a result of intense public criticism and political pressure, SUNY's trustees decided to postpone the decision to award the RFP to Fortis" (id.). 
"As a result of further public criticism and pressure from the ongoing litigation, SUNY re-opened the RFP process to the original bidders, allowing them to further refine the medical components of their proposals" (id., ¶ 25). 
SUNY agreed to conduct a third RFP as part of settlement of the Lawsuits (see id., ¶ 26). Under the settlement, the RFP would be opened to new bidders and favor proposals that included a full-service hospital (see id.). The settlement agreement allowed SUNY to discontinue providing medical services at LICH as of May 22, 2014 (see id., ¶ 28).
"Fortis's proposal was in third place after the nine proposals submitted in response to the third RFP were evaluated" (id., ¶ 35). However, after the two highest-ranked bidders were unable to consummate a binding agreement with Downstate at LICH, Fortis was declared the winner (see id., ¶¶ 36-37).
"The central component of Fortis's proposal, which it submitted on March 19, 2014, was its health care partnership with NYUHC" (id., ¶ 41). "Fortis's proposal was centered around providing healthcare to the community through NYUHC, and included NYUHC's commitment . . . to lease between 50,000 and 60,000 square feet of space at market rates from Fortis. In other words, NYUHC would provide and manage health care services at LICH as a tenant of Fortis" (id., ¶¶ 41-42).
NYUHC's commitment was reflected in a December 30, 2013 letter of intent, which provided that if Fortis acquired certain premises and constructed a "New Medical Building," NYUHC would lease the premises and operate a medical facility (id., ¶¶ 44-45). The parties agreed in principle to a 20-year lease of the New Medical Building for a price of $55 per square foot, with 2% annual increases (see id., ¶ 46).
"The parties originally contemplated that it would take 2-3 years for completion of the new facility. In the interim, NYUHC would run an emergency department in the old hospital and Fortis would pay the operating expenses for that building, thereby relieving SUNY of this heavy financial obligation" (id., ¶ 47). 
Fortis's bid was accepted, and the parties entered into a Purchase and Sale Agreement dated June 30, 2014 (see NYSCEF Doc No. 42 ["Original PSA"]), by which Cobble Hill would purchase about two dozen parcels from Downstate at LICH for $240 million (less certain, specified credits), with Fortis serving as a limited guarantor of Cobble Hill's performance.
According to Fortis, "the single most significant factor in [its] decision to sign the Original PSA" was NYUHC's commitment to substantially increase the amount of leased medical space in the New Medical Building (ACC, ¶¶ 49-50). "Then, after the Original PSA was signed, NYUHC did a dramatic about-face" (id., ¶ 51).
"SUNY and NYUHC held a series of meetings, without Fortis, in which NYUHC procured SUNY's commitment to revise the deal to cut out Fortis from the construction and leasing of the New Medical Building. NYUHC further procured SUNY's commitment to require Fortis to buy the property on which the New Medical Building would be constructed but to convey the property directly from SUNY to NYUHC for no consideration. Basically, NYUHC was demanding a $60 million donation (in the form of land) from Fortis" (id., ¶ 52). NYUHC also decided that it would not hire Fortis to build the medical facility (see id., ¶ 54).
Because "NYUHC's commitments were most critical to Fortis in its submission of a $240 million purchase price in connection with its proposal" (id., ¶ 55), "Fortis refused to proceed with the deal as proposed by SUNY and NYUHC, and advised SUNY that it would substitute NYUHC with another healthcare provider" (id., ¶ 59). But "SUNY did not want Fortis to replace NYUHC with another healthcare provider because doing so, according to SUNY, would lead to bad press and likely further legal challenges to the RFP process" (id., ¶ 60). 
Instead, "senior SUNY officials, particularly Vice-Chancellor Jim Malatras," convinced Fortis to proceed with the "new deal" by promising "credits against the final purchase price for all of the losses and expenses incurred by Fortis as a result of NYUHC's change of position" (id., ¶¶ 61, 70). These credits allegedly would make Fortis whole for: (i) "the loss of NYUHC's market rate rent" (id., ¶ 61); (ii) Fortis's expenses "to complete the demolition work required for NYUHC to build its New Medical Building" (id., ¶ 62); (iii) the value of the land to be conveyed to NYUHC for the New Medical Building (see id., ¶ 63); (iv) Fortis's operating expenses during the period in which NYUHC operated an interim emergency department (see id., ¶ 87); and (v) the costs to Fortis of delaying construction of its residential tower, which, for engineering reasons, could not proceed until substantial completion of the New Medical Building (see id., ¶¶ 92-93). The value of these credits consisted of the fixed sum of $75 million, together with expenses, totaling to $96 million (see id., ¶¶ 5, 93-98).
"SUNY could not be seen publicly to amend the deal documents to reflect the agreement regarding credits to be applied in favor of Fortis against the final purchase price due to the controversy surrounding the project, but assured Fortis that there would be dollar-for dollar credit" (id., ¶ 71). Fortis accepted SUNY's commitment, which was "made both orally and in writing, embodied in emails exchanged by Malatras with representatives of Fortis and further delineated in a letter from Malatras to Fortis's representatives" (id., ¶ 64). 
In October 2014, Downstate at LICH, Cobble Hill, Fortis and NYUHC executed the PSA, which was made effective as of June 30, 2014 (see id., ¶¶ 75, 81; PSA at 1). Under the new arrangement, Cobble Hill, as Purchaser, agreed to pay Downstate at LICH, as Seller, for the New Medical Site, but to convey the premises to NYUHC at no charge (see PSA, § 1.3 [a]). Further, the PSA assigned to NYUHC the obligation to construct the New Medical Building and provide medical services therein (see id., § 15.1 [b-d]).
As restructured, the deal called for the three closings described supra: (1) the Initial Closing, at which Cobble Hill would pay about one-half of the purchase price and receive title to the Initial Closing Premises; (2) the closing on the New Medical Site, which was made subject to Cobble Hill's obligation to re-convey the land to NYUHC for construction of the New Medical Building after demolishing existing structures; and (3) a Final Closing, at which Cobble Hill would pay the balance of funds due and receive title to the Final Closing Premises. 
The PSA obliged NYUHC to operate an emergency department prior to the New Medical Building becoming operational (see id., § 10.3 [b]). To provide for that, Downstate at LICH agreed to lease portions of the old medical premises ("Interim Medical Premises") to Cobble Hill under an "Amended Interim Lease" that obliged Cobble Hill to sub-lease the space to NYUHC under an "Interim Sublease" (id., §§ 1.1 [b], 10.3 [b]; see NYSCEF Doc Nos. 20-21 [Amended [*3]Interim Lease and Interim Sublease, both dated October 7, 2014 and made effective as of June 30, 2014]; see also ACC, ¶¶ 77-79, 82). The PSA conditioned Cobble Hill's obligation to proceed to the Final Closing on, among other things, NYUHC having "vacated the Interim Medical Premises pursuant to the terms of the Interim Sublease" (PSA, § 4.2 [e] [vii]).
The financial terms established by the PSA, including down payments, credits and the scope of Fortis's guarantee, were modified on August 21, 2015 through a letter "waiver" agreement (see VAC, ¶¶ 11, 17; NYSCEF Doc No. 22 ["Waiver"], § 4 [C], [D]).[FN2]

The Initial Closing was held on September 1, 2015 (see ACC, ¶ 83). Per the PSA, Downstate at LICH conveyed the sixteen (16) initial parcels to Cobble Hill in exchange for $120 million (see id.). Of that sum, "approximately $60 million represented the property to be conveyed to NYUHC at zero cost within a year, with the New Medical Building to be constructed within three years" (id.). 
For its part, Fortis delivered the Guarantee to Downstate at LICH, promising to pay $8 million if Cobble Hill failed to proceed to the Final Closing (see id., ¶ 88; Guarantee, § 1.1). "The Guarantee, by its terms, requires approval and execution by the Attorney General and the Comptroller of the State of New York"; however, "[n]o such approval was given" (ACC, ¶ 89; see Guarantee, § 2.2).
"NYUHC began operating an interim emergency department . . . in partnership with Fortis" following the Initial Closing (ACC, ¶ 86). "When Fortis agreed to pay operating expenses for the old LICH hospital building so that NYUHC could operate the emergency department there, NYUHC was supposed to move into its New Medical Building within 2-3 years of the initial closing" (id., ¶ 87). However, the "closing for the NYUHC property did not occur until 2020, and NYUHC's move . . . did not occur until 2023, several years behind schedule" (id.; see also id., ¶¶ 90-91).
"NYUHC knew that Fortis could not start vertical construction of its adjoining residential tower ('Two River Park') on one of the parcels purchased as part of the [Initial Closing] until NYUHC had substantially completed its facility, because a portion of the Fortis building was to be cantilevered over the NYUHC building" (id., ¶ 92). "As a result of NYUHC's delay, Fortis was not able to . . . commence construction of [the tower] and . . . incurred carrying costs exceeding $12.1 million, and ultimately lost $50 million of equity when it was forced to convey Two River Park and two other 'cross-collateralized' parcels to its lender" (id., ¶ 93). 
Overall, Fortis and Cobble Hill claim to have incurred about "$96 million in lost value and additional costs" (id., ¶¶ 94-98) that they claim are subject to the alleged agreement of SUNY officials "to make Fortis whole for any and all increased costs and losses caused by the fundamental change in the deal structure" (id., ¶ 99).[FN3]

D. The Final Closing
On April 28, 2023, Downstate at LICH gave notice of the Final Closing, which was scheduled for June 9, 2023 (see NYSCEF Doc No. 26). NYUHC then assured Cobble Hill and Fortis on May 24, 2023 that the Interim Medical Premises would be vacated by such date (see NYSCEF Doc No. 27). 
On June 8, 2023, Cobble Hill wrote to Downstate at LICH, stating that the obligation to proceed to a Final Closing Date had not been triggered because (i) the "specialty pharmacy" was [*4]not yet operating on the New Medical Premises, and (ii) there had been no substantiation of NYUHC's claim that it will have vacated the Interim Medical Premises by the Final Closing Date (NYSCEF Doc No. 28). There was no claim of entitlement to dollar-for-dollar credits (or other extra-contractual set-offs) in that correspondence or at the June 9, 2023 tender (see NYSCEF Doc No. 33).
The parties eventually agreed to an August 8, 2023 Final Closing Deadline. However, Cobble Hill refused to close, citing: (i) NYUHC's failure to vacate the Interim Medical Premises "in good order," as required by the PSA and Interim Sublease; and (ii) Downstate at LICH's "refus[al] to credit [promised losses and expenses] against the final amount" (NYSCEF Doc No. 34 at 3-4; see NYSCEF Doc No. 29; see also ACC, ¶¶ 100-107). 
E. This Litigation
Downstate at LICH commenced this action on August 9, 2023, seeking to recover $8 million from Fortis under the Guarantee based on Cobble Hill's alleged default.
Fortis joined issue on September 19, 2023 by serving an answer that interposed various affirmative defenses, alleged 14 counterclaims, and joined NYUHC as a counterclaim defendant (see NYSCEF Doc No. 11 ["Original Answer"]). Fortis also filed a notice of pendency based on its counterclaim for specific performance (see NYSCEF Doc No. 36 ["NOP"]).
On October 3, 2023, Downstate at LICH filed two motions: (1) a motion under CPLR 3211 (a) (1) and (7) for dismissal of Fortis's counterclaims and cancellation of the NOP (see NYSCEF Doc No. 13); and (2) a motion under CPLR 3212 for summary judgment on its claim under the Guarantee (see NYSCEF Doc No. 37).
On November 3, 2023, Fortis filed opposition to the motions and cross-moved under CPLR 3212 for dismissal of the Complaint (see NYSCEF Doc No. 69). 
Fortis also filed a Verified Answer and Amended Counterclaims on the same date (see NYSCEF Doc No. 68), which was later re-filed as corrected (see NYSCEF Doc No. 80 [VAC]; see also NYSCEF Doc No. 100). In this amended pleading, Fortis acknowledges its contractual duty to provide the Guarantee (see ACC, ¶ 88), but adds the allegation that "[t]he Guarantee, by its terms, requires approval and execution by the Attorney General and the Comptroller of the State of New York. No such approval was given" (id., ¶ 89).[FN4]

Also on November 3, 2023, Fortis sent a letter to Downstate at LICH asserting that "[t]he Guarantee has never come into effect because it has never been countersigned and approved by the Attorney General and State Comptroller, despite the passage of over eight years since it was signed by the parties" (NYSCEF Doc No. 74). "In any event, Fortis hereby revokes, rescinds and terminates the [G]uarantee" (id.).
Fortis then moved for leave to amend the VAC to add "an affirmative defense of a failure of condition precedent: that the Guarantee . . . is invalid because the . . . Attorney General and Office of the Comptroller did not approve and sign it" (NYSCEF Doc Nos. 103-104, 106). "Given the liberal standard for amending a pleading," Downstate at LICH did "not oppose this motion" (NYSCEF Doc No. 108 at 2).
On December 1, 2023, Downstate at LICH sought leave to supplement the motion record by "providing a true and correct copy of the Guarantee that includes thereon AG and OSC approvals" (NYSCEF Doc No. 111). The Court granted leave but allowed Fortis to respond [*5]through a brief supplemental filing (see NYSCEF Doc Nos. 130, 133-138). 
Fortis argued that the Guarantee was "merely an offer with a condition precedent to formation" prior to Attorney General and Comptroller's approvals (NYSCEF Doc No. 141 at 1 [emphasis omitted]). Fortis therefore contends that it was entitled to revoke the offer on November 3, 2023, "before the AG and OSC ever approved it, which rendered the document null and void" (id.).
Finally, on December 1, 2023, NYUHC filed a pre-answer motion to dismiss Fortis's counterclaims under CPLR 3211 (a) (1), (5) and (7) (see NYSCEF Doc No. 114). 
Oral argument was held on March 8, 2024, a certified transcript was filed on March 12, 2024 (see NYSCEF Doc No. 147 ["Transcript"]), and this Decision & Order follows.
GENERAL PRINCIPLES
On a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), a court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88 [1994]). "Dismissal . . . is warranted if the plaintiff fails to assert facts in support of an element of the claim, or if the factual allegations and inferences to be drawn from them do not allow for an enforceable right of recovery" (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017]). 
"[A] motion pursuant to CPLR 3211 (a) (1) must be granted where the documentary evidence 'conclusively refutes [claimant's] factual allegations' and establishes a defense as a matter of law" (Doller v Prescott, 167 AD3d 1298, 1299 [3d Dept 2018], quoting Kolchins v Evolution Mkts., Inc., 31 NY3d 100, 106 [2018]). 
"To dismiss a cause of action pursuant to CPLR 3211 (a) (5) on the ground that it is barred by the applicable statute of limitations, a defendant bears the initial burden of demonstrating, prima facie, that the time within which to commence the action has expired" (Krog Corp. v Vanner Group, Inc., 158 AD3d 914, 915 [3d Dept 2018] [internal quotation marks and citations omitted]). "If the defendant meets this burden, the burden then shifts to the plaintiff to raise a question of fact as to whether the statute of limitations has been tolled or was otherwise inapplicable, or whether the action was actually commenced within the period propounded by the defendant" (id. at 916 [internal quotation marks, brackets and citations omitted]). 
Finally, "[t]o prevail on a motion for summary judgment, the moving party must establish prima facie entitlement to judgment as a matter of law by adducing sufficient competent evidence to show that there are no issues of material fact" (Staunton v Brooks, 129 AD3d 1371, 1372 [3d Dept 2015]). If the movant fails to satisfy this burden, the motion must be denied, "regardless of the sufficiency of the opposing papers" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). But if the movant meets the initial burden, the burden shifts to the nonmoving party to demonstrate the existence of disputed material facts or a legal defense to the claim (see id.).
I. DOWNSTATE AT LICH'S MOTION TO DISMISS COUNTERCLAIMS
Downstate at LICH moves under CPLR 3211 (a) (1) and (7) for the dismissal of the counterclaims alleged by Fortis and Cobble Hill and for cancelation of the NOP.
A. Claims Based on the Alleged Promise of Credits
Certain of the counterclaims are based on the alleged promise of credits against the $120 million to be paid by Cobble Hill at the Final Closing, a promise allegedly intended to ameliorate the financial impact of the changes to the deal structure made at NYUHC's behest ("Revised Deal Structure"). These are the counterclaims for declaration of contractual rights (Count II), specific performance (Count V, in part), breach of contract (Count VI) and breach of the implied covenant of good faith and fair dealing (Count X, in part). Downstate at LICH argues principally that the counterclaims based on the alleged promise of credits are barred by the merger and disclaimer clauses of the PSA and Waiver.
"The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing" (Jarecki v Shung Moo Louie, 95 NY2d 665, 669 [2001] [citation omitted]). Thus, a [*6]merger clause typically precludes a party from presenting allegations or evidence of prior oral or written agreements between the parties regarding the same subject matter (see id.; Transcan Sys., Inc. v Seldat Distrib., Inc., 209 AD3d 911, 913 [2d Dept 2022]; Stevens & Thompson Paper Co., Inc. v Niagara Mohawk Power Corp., 49 AD3d 1011, 1014-1015 [3d Dept 2008]; cf. Safariland, LLC v H.B.A. Agencies, Ltd., 198 AD3d 519, 520-521 [1st Dept 2021]). 
"Where the contract specifically disclaims the existence of . . . representations, a cause of action alleging breach of contract based on such a . . . representation cannot be maintained" (Simone v Homecheck Real Estate Servs., Inc., 42 AD3d 518, 521 [2d Dept 2007]; see Cobalt Partners, L.P. v GSC Capital Corp., 97 AD3d 35, 42 [1st Dept 2012]).
The Original PSA was signed on June 30, 2014, and the alleged promise of credits was made by a SUNY official, James Malatras, sometime prior to the October 7, 2014 signing of the amended PSA (see ACC, ¶¶ 61-81). Despite the claimed promise, the amended PSA provided Cobble Hill with the same closing credits as the Original PSA, without making any provision for losses and expenses attributable to the Revised Deal Structure (see PSA, §§ 2.1 [c], [d]; 13.2 [a] [i]). And the PSA includes both a merger clause and broad disclaimers regarding extra-contractual representations:
All prior statements, understandings, representations and agreements between the Parties, oral or written, are superseded by, and merged into, this [PSA] and the Incorporated Documents, which alone fully and completely express the agreement among the Parties in connection with the transactions contemplated hereby and which is entered into after full investigation, no Party relying upon any statement, understanding, representation, or agreement made by another not embodied in this [PSA] or the Incorporated Documents. . . . (id., § 26.3).
Additionally, Section 9.2 declares that the PSA, "as written, contains all of the terms of the agreement entered into between the Parties" (id., § 9.2), and it sets forth Cobble Hill's acknowledgment and agreement that neither Downstate at LICH, its affiliates nor the State of New York "have made any representations . . . , or held out any inducements, to [Cobble Hill], other than as expressly set forth [in the PSA]" (id.). 
The parties then executed the Waiver on August 21, 2015. The Waiver modified certain financial terms of the transaction, including the credits that Cobble Hill would receive at the Final Closing, but did not grant any additional credits to Cobble Hill on account of the Revised Deal Structure (see Waiver, § 1 [E]). And, like the PSA, the Waiver "supersedes all prior agreements, whether written or oral, among the Parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter" (id., § 6).
Thus, following the alleged promise of additional credits by a SUNY official, Fortis and Cobble Hill assented to the PSA, an intricate 110-page contract among hyper-sophisticated commercial parties that: (i) "alone fully and completely express[es] the agreement among the Parties in connection with the transactions," "contains all of the terms of the agreement entered into between the Parties," and "supersede[s]" and "merge[s]" any "prior statements, understandings, representations and agreements between the Parties, oral or written"; (ii) confirms that neither "Seller nor any of Seller's Affiliates nor the State of New York have made any representations . . . , or held out any inducements, to [Cobble Hill], other than as expressly set forth [in the PSA]"; and (iii) disclaims reliance "upon any statement, understanding, representation, or agreement made by another not embodied in [the PSA]" (PSA, §§ 9.2, 26.3). And just ten months later, the contracting parties revisited the financial terms of the PSA in the Waiver, another integrated agreement that made no provision for credits attributable to the Revised Deal Structure.
On these facts, any claimed prior oral or written promise of additional credits "was necessarily extinguished" when the amended PSA became effective (Torres v D'Alesso, 80 AD3d 46, 53 [1st Dept 2010]). "At that point, [Fortis and Cobble Hill] could not expect to rely on any previous understanding or oral representation that was not included in the mutually executed [*7]written document" (id.). 
In concluding that the counterclaims predicated upon the alleged promise of credits are barred by the express terms of the PSA and Waiver, the Court is unpersuaded by Fortis and Cobble Hill's contention that the alleged promise is an "instrument" that "constitute[s] part of the same transaction" as the PSA and Waiver, and, therefore, must be "be interpreted together" with the formal agreements (BWA Corp. v Alltrans Express U.S.A., Inc., 112 AD2d 850, 852 [1st Dept 1985]). This argument is based on the principle that, "[i]n the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument" (id.). 
Even if Malatras's alleged oral promises or his August 14, 2014 email to a lobbyist for Fortis stating that he "think[s] [he's] good" with a "summary" of a "concept" and "deal points" (NYSCEF No. 79 at 2) could be deemed an "instrument[] executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction" as the October 7, 2014 PSA (BWA Corp., 112 AD2d at 952), the parties to the PSA could not have more clearly expressed their mutual intention to abrogate and extinguish the prior promises (see Bernard v Sayegh, 104 AD3d 600, 600 [1st Dept 2013] [distinguishing BWA Corp.]; cf. In re: Residential Capital, LLC, 533 BR 379, 397 [Bankr SD NY 2015] ["The agreements together encompass the entire transaction of the sale . . . , refer to one another, and should therefore be read together."]). 
Finally, Fortis and Cobble Hill may not pursue recovery of credits under the implied covenant of good faith and fair dealing. As discussed in Part III (B), infra, the implied covenant of good faith and fair dealing "'cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights'" (Canandaigua Natl. Bank & Trust Co. v Acquest S. Park, LLC, 170 AD3d 1663, 1665 [4th Dept 2019], quoting Fesseha v TD Waterhouse Inv. Servs., 305 AD2d 268, 268 [1st Dept 2003]). Implying a right to additional closing credits would inappropriately nullify the financial terms of the PSA and Waiver and create new, independent contractual rights in favor of Cobble Hill.
Accordingly, the counterclaims based on the alleged promise of credits must be dismissed as barred by the clear and express terms of the PSA and the Waiver.
B. Misrepresentation-Based Claims
Fortis and Cobble Hill's counterclaims for fraudulent inducement (Count XIII) and negligent misrepresentation (Count XIV) are based on alleged misrepresentations by Malatras regarding closing credits. Downstate at LICH argues that the counterclaims are conclusively defeated by the PSA's disclaimers, and, in any event, do not allege actionable misrepresentations upon which Fortis or Cobble Hill could reasonably have relied.
1. Disclaimers
"[A]lthough a general merger clause will not preclude parol evidence regarding fraud in the inducement or fraud in the execution, where the parties expressly disclaim reliance on the particular misrepresentations, contrary parol[] evidence is barred" (Rosenblum v Glogoff, 96 AD3d 514, 514-515 [1st Dept 2012] [collecting cases]). Stated differently, "[d]isclaimer clauses and merger clauses in a contract for the sale of property are ineffective to bar the consideration of parol evidence of misrepresentation by the seller unless the clauses refer to the particular subject matter as to which the representations are alleged with sufficient specificity to put the buyer on notice as to the clauses' intended effect" (Culinary Connection Holdings v Culinary Connection of Great Neck, 1 AD3d 558, 559 [2d Dept 2003], lv denied 3 NY3d 601 [2004]; see Citibank v Plapinger, 66 NY2d 90, 94-95 [1985]; CFJ Assoc. of NY v Hanson Indus., 274 AD2d 892, 894 [3d Dept 2000]). 
The PSA not only contains language superseding all prior agreements and declaring the writing to "fully and completely express the agreement among the Parties" (PSA, § 26.3); it also includes strong language by which Cobble Hill acknowledged that neither Downstate at LICH, its affiliates nor the State of New York "made any representations . . . , or held out any inducements," other than those expressed in the PSA (id., § 9.2). And both Cobble Hill and [*8]Fortis acknowledged that they were not "relying upon any statement, understanding, representation, or agreement made by another not embodied" in the PSA (id., § 26.3).[FN5]

Having affirmatively represented that the PSA constitutes the complete agreement of the parties, denied the existence of extra-contractual representations, and disclaimed reliance on any representations not included in the writing signed by the parties and approved by the Attorney General and Comptroller, the misrepresentation-based counterclaims are barred (see Natoli v NYC Partnership Hous. Dev. Fund Co., Inc., 103 AD3d 611, 612-613 [2d Dept 2013] [upholding dismissal of fraud claim where purchase agreement "contained specific disclaimer provisions by which the plaintiff disavowed reliance upon any representations extrinsic to that agreement"]; see also Pate v BNY Mellon-Alcentra Mezzanine III, LP, 163 AD3d 429, 430 [1st Dept 2018]; WT Holdings Inc. v Argonaut Group, Inc., 127 AD3d 544, 544 [1st Dept 2015]; Hewlett v Staff, 235 AD2d 696, 697 [3d Dept 1997]).[FN6]

2. Pleading Sufficiency
Even if the misrepresentation-based counterclaims were not barred by the PSA, the counterclaims do not allege actionable misrepresentations upon which Fortis or Cobble Hill could justifiably have relied.
The elements of fraudulent inducement are "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury" (Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]).
"A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (J.A.O. Acquisition Corp. v Stavitsky, 8 NY3d 144, 148 [2007] [citations omitted]).
Through their verified answer (see ACC, ¶¶ 61-70, 181-185), as amplified by affidavits submitted in opposition to the motion, Fortis and Cobble Hill maintain that they executed the PSA in reliance on the promise of James Malatras that "SUNY would compensate Fortis with substantial 'make-whole' credits . . . from the amount due at the Final Closing in order to compensate [Fortis and Cobble Hill] for the additional expenses and costs" attributable to the Revised Deal Structure (NYSCEF Doc No. 75 ["Kestenbaum Aff."], ¶ 6). 
Louis Kestenbaum, a principal of Fortis, attests that "James Malatras pulled [him and] Joel Kestenbaum . . . out of [a September or October 2014] meeting with [a] larger group into a smaller conference room" (id., ¶ 5). "While in that smaller conference room, Malatras agreed that SUNY would compensate Fortis with substantial 'make-whole' credits to be applied in Fortis and [Cobble Hill's] favor . . . at the Final Closing in order to compensate for the significant additional expenses and costs" associated with the Revised Deal Structure (id., ¶ 6). "Malatras agreed that these credits would be provided by SUNY to make Fortis and Cobble Hill whole on all additional costs and expenses . . . , including (1) for the loss of the market rate lease to NYU; (2) expenses for demolition required for the construction of the New Medical Building; (3) [*9]Hospital operating expenses until NYU began operating its New Medical Building; [and] (4) any losses incurred by Fortis as a result of its loss of control of the NYU site" (id., ¶ 7). 
"Malatras assured [the Kestenbaums] he had the power to agree to the changes to the deal and that anything he promised would be accepted by the SUNY board. [The Kestenbaums] trusted Malatras to cut a deal between Fortis and SUNY because he was more than Vice-Chancellor; he had been one of Governor Cuomo's senior executives and wielded political power" (id., ¶ 8).[FN7]
"Malatras began writing out the promise of credits on a legal pad . . . , but [the Kestenbaums] told him that [they] wanted the agreement regarding credits in the form of a letter" (id., ¶ 9). "Malatras provided this letter to [them] either at the meeting or soon thereafter. Fortis has conducted searches and to date has been unable to locate the letter" (id., ¶ 10).[FN8]

Even with the benefit of the additional allegations made in opposition to the motion, and disregarding Fortis and Cobble Hill's failure to particularize between plaintiff/counterclaim-defendant Downstate at LICH (a private corporation) and nonparty SUNY (a State agency) (see CPLR 3016 [b]; see also n 1, supra), Fortis and Cobble Hill have not stated a viable counterclaim for fraudulent inducement. 
Initially, by Fortis and Cobble Hill's own account, Malatras was not the final word on the credits allegedly promised by "SUNY" but sought herein from Downstate at LICH. While "assur[ing] Fortis that he had the power to agree to the changes to the deal," Malatras's alleged representations explicitly put Fortis and Cobble Hill on notice that he was not the ultimate decisionmaker, and the promise of additional credits would have to "be accepted by the SUNY board [of trustees]" (ACC, ¶ 66; see Kestenbaum Aff., ¶ 8). There can be no justifiable reliance on "a promise regarding future acts" (Van Kleeck v Hammond, 25 AD3d 941, 943 [3d Dept 2006]), particularly where the promise is dependent on the acts of a third party.
More fundamentally, even if Malatras had the unilateral authority to grant financial concessions of as much as $96 million to the winner of a competitive State procurement (see PSA, Statement of Facts at 1), any reliance by Fortis and Cobble Hill on Malatras's oral promises, his email to Fortis's lobbyist saying he "think[s] [he's] good" with some "deal points" (NYSCEF No. 79 at 2) or a secret side-letter that Fortis allegedly requested but cannot locate (see Kestenbaum Aff., ¶ 10) was unjustified as a matter of law.
A party contracting with a State agency or instrumentality cannot reasonably rely on a State official's promises of financial concessions, whether oral or written, where those promises do not appear in the formal contracts signed by the parties and approved by the Attorney General and Comptroller pursuant to State Finance Law § 112. This is particularly true where the alleged secret promise of financial concessions, amounting to almost $100 million, was intentionally omitted from the formal agreements to avoid scrutiny from competing bidders, the press and the public (see VAC, ¶¶ 71-73; see also Matter of Laborers' Intl. Union of N. Am., Local No. 17 v New York State Dept. of Transp., 280 AD2d 66, 70 [3d Dept 2001] ["the purpose underlying State Finance Law § 112 is . . . to protect the public from governmental misconduct and improvidence"]; Transcript at 21, 28-29).
And given that reasonable reliance is an element of the negligence misrepresentation claim, that cause of action also fails as a matter of law.
C. Quasi-Contractual Claims
Where the "parties have entered into a contract governing a particular subject matter," [*10]there can be no quasi-contractual claims arising from the same subject matter (IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 142 [2009]; see Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388-389 [1987]). 
The quasi-contractual counterclaims (Counts XV and XVI) are predicated on (i) the re-conveyance of the New Medical Site to NYUHC at no cost, (ii) the costs incurred in demolishing existing structures on the New Medical Site prior to re-conveyance, and (iii) the costs associated with operating the Interim Medical Premises (see ACC, ¶¶ 195-200, 203-204). All these issues are addressed in the PSA and Waiver — integrated agreements that comprehensively govern the subject matter. 
As such, the quasi-contractual counterclaims must be dismissed as to Downstate at LICH.
D. Counterclaims Premised on NYUHC's Failure to Vacate in "Good Order"
Certain of the counterclaims against Downstate at LICH are based on allegations that NYUHC did not vacate the Interim Medical Premises "in good order," as allegedly required by the Interim Sublease. These are the counterclaims for declaratory relief (Count I), specific performance (Count V, in part) and breach of contract (Count VII).
NYUHC's vacatur of the Interim Medical Premises is a condition precedent to the Final Closing (see PSA, § 4.2 [e] [vii]), but the PSA does not impose any duties upon Downstate at LICH relative to that condition. In fact, Fortis and Cobble Hill recognize that it was "NYUHC's obligation" to vacate the Interim Medical Premises in good order (NYSCEF Doc No. 72 at 18-19). Thus, the counterclaims for specific performance and breach of contract must be dismissed insofar as they are predicated upon NYUHC's alleged failure to properly vacate.
The remaining counterclaim seeks a declaration that Downstate at LICH had no basis to declare Cobble Hill in default under the PSA because this condition precedent to the Final Closing was not satisfied (see ACC, ¶¶ 108-113). For essentially the reasons stated in Parts II (B) and III (D), infra, the branch of Downstate at LICH's motion seeking dismissal of Count I is denied.
E. Return of Deposit
Given that Downstate at LICH did not breach the PSA by reason of NYUHC's alleged failure to properly vacate the Interim Medical Premises or its refusal to provide Cobble Hill with additional closing credits, Cobble Hill has not alleged facts which, if credited, would warrant the return of its $7 million deposit (see id., ¶¶ 160-162). Therefore, Count IX is dismissed.
F. NOP
A notice of pendency may be filed only where "the judgment demanded would affect the title to, or the possession, use or enjoyment of, real property" (CPLR 6501 [a]).
The counterclaim for specific performance (Count V) is the only one that may affect title to property, and that counterclaim must be dismissed (see Part I [A], [D], supra). Consequently, the NOP must be canceled (see CPLR 6514 [a]; Preston v Nichols, 216 AD3d 1398, 1400 [4th Dept 2023]; Gregware v Key Bank of NY, 218 AD2d 859, 860 [3d Dept 1995], lv denied 87 NY3d 803 [1995]).
G. Conclusion
For the reasons stated above, the counterclaims alleged by Fortis and Cobble Hill against Downstate at LICH must be dismissed, except as to the declaratory relief requested in Counts I and III.
II. MOTIONS RELATED TO THE GUARANTEE
Downstate at LICH moves for summary judgment against Fortis under the Guarantee, its only claim for affirmative relief. Fortis opposes the motion and cross-moves for summary judgment dismissing the claim.
To recover under a guarantee, a movant for summary judgment must proffer "evidence of the executed . . . guarantee, as well as [the guarantor's] default in payment" (Creative Culinary Concepts, LLC v Sam Greco Constr., Inc., 134 AD3d 1294, 1295 [3d Dept 2015]). 
Downstate at LICH submits a copy of the Guarantee signed by the parties, by which [*11]Fortis unconditionally guaranteed to pay $8 million upon Cobble Hill's default under the PSA or Waiver (see Guarantee, § 1.1), as well as proof of two defaults: (i) Cobble Hill's insistence on credits of as much as $96 million (see ACC, ¶¶ 94-100) against the $120 million to be paid at the Final Closing, and (ii) Cobble Hill's refusal to proceed to the Final Closing by the time-is-of-the-essence deadline of August 8, 2023. 
Through the foregoing submissions, Downstate at LICH has demonstrated its prima facie entitlement to recovery of $8 million from Fortis under the Guarantee. The burden therefore shifts to Fortis to raise a triable issue of fact or legal defense to enforcement.
In opposition to Downstate at LICH's motion and in support of its own cross motion for summary judgment, Fortis makes two principal arguments: (i) the Guarantee was revoked prior to the occurrence of a condition precedent to contract formation; and (ii) Cobble Hill was not in default, because a condition precedent to the Final Closing, NYUHC's vacatur of the Interim Medical Premises pursuant to the Interim Sublease, had not occurred.[FN9]

A. Attorney General/Comptroller Approval
Fortis's first argument is based on Section 2.2 of the Guarantee, which reads as follows:
Approvals. The Parties hereby acknowledge and agree that this Agreement is subject to the approval of the [Attorney General] and the [Comptroller] and this Agreement shall not be valid and enforceable until such approvals are given. The parties further acknowledge and agree that this Agreement shall not be effective until it has been fully approved and executed by all applicable governmental agencies, including AG and OSC. In the event such approvals are obtained (regardless of when they are obtained), the effective date of this Agreement shall be the Effective Date (emphasis added).
The copy of the Guarantee annexed to the Complaint (see NYSCEF Doc No. 5) is not signed by the Attorney General or Comptroller. Their approvals did not appear on a copy of the Guarantee until November 29, 2023, following submission of Downstate at LICH's motion for summary judgment and Fortis's cross motion.
Fortis now argues that it validly revoked the Guarantee on November 3, 2023. According to Fortis, "no contract [had] ever [come] into existence" before the approvals of the Attorney General and Comptroller were obtained on November 29, 2023, and the Guarantee was, on November 3, 2023, "merely an offer [to contract] with a condition precedent to formation" (NYSCEF Doc No. 141 at 1 [emphasis omitted]; see NYSCEF Doc No. 74).
"A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises" (Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co., 86 NY2d 685, 690 [1995] [internal quotation marks and citation omitted]). "As is relevant here, a condition precedent can be 'a condition precedent to the formation or existence of the contract itself,' where 'no contract arises unless and until the condition occurs'" (Bedoya v Rodriguez, 186 AD3d 1308, 1309 [2d Dept 2020], quoting Oppenheimer, 86 NY2d at 690 [internal quotation marks and citation omitted]).
Section 2.2 states that the Guarantee "shall not be valid and enforceable until [the Attorney General and Comptroller's] approvals are given." The same section recites the parties' agreement and acknowledgement that the Guarantee "shall not be effective until it has been fully approved and executed by all applicable governmental agencies," including the Office of the Attorney General ("OAG") and Office of the State Comptroller ("OSC").
The Court concludes that the Guarantee's "use of terms such as 'if,' 'unless' and 'until' constitutes 'unmistakable language of condition'" (MHR Capital Partners LP v Presstek, Inc., 12 [*12]NY3d 640, 645 [2009], quoting Oppenheimer, 86 NY2d at 691). By conditioning the validity, effectiveness and enforceability of the Guarantee upon its full approval and execution by the Attorney General and Comptroller, the parties established "an expressly agreed-upon condition precedent to the formation of [a guarantee] contract" (Matter of Worth Constr. Co., Inc. v Hevesi, 32 AD3d 629, 630 [3d Dept 2006], affd 8 NY3d 548 [2007]). 
In opposition, Downstate at LICH argues principally that the alleged condition precedent of Attorney General and Comptroller approval was satisfied more than eight years prior to the purported revocation.[FN10]
According to Downstate at LICH, the Attorney General and Comptroller approved the Guarantee through their approvals of the PSA on October 28, 2014 (see PSA at 110) and the Waiver on August 26, 2015 (see Waiver at 13) (see NYSCEF Doc No. 87 at 6-7; Transcript at 47-48).
Downstate at LICH bases this argument on the fact that the PSA submitted to the Attorney General and Comptroller for review and approval was accompanied by two dozen exhibits, one of which was an earlier, unsigned draft of the Guarantee (see PSA at ii) that Fortis was obliged to deliver at the Initial Closing "duly executed" in "substantially . . . the form attached" (id., § 2.3). Similarly, an unexecuted copy of a revised draft of the Guarantee was annexed to the Waiver (see Waiver, § 1 [C] & Ex. A), which Fortis again was obliged to deliver "duly executed" in "substantially . . . the form attached" (Waiver, § 1 [C]).
In arguing that the Attorney General and Comptroller approved the Guarantee through their approvals of the PSA and Waiver, Downstate at LICH relies on City of NY v State of NY (87 NY2d 982 [1996]). That case concerned the Comptroller's approval of a lease for a fixed duration, with an option for extensions on the same terms by mutual agreement (see id. at 985). In a suit brought by the City to enforce an extension, the Court of Appeals rejected the State's defense that the extension was invalid for noncompliance with State Finance Law § 112 (2), which requires the Comptroller to approve contracts for or by State agencies exceeding a prescribed monetary threshold (see id. at 985-986). The Court of Appeals held that State Finance Law § 112 did not restrict the Comptroller's power or discretion to approve a lease that allowed for extensions on the same terms by mutual agreement (see id. at 986).
This obviously is a much different case. Unlike City v State, the issue here is not compliance with State Finance Law § 112; this case concerns a condition precedent to contract formation expressed within the instrument itself. The contracting parties, who are sophisticated commercial entities represented by experienced counsel, made the approvals of the Attorney General and Comptroller "an expressly agreed-upon condition precedent to the formation of [a guarantee] contract" (Worth Constr., 32 AD3d at 630; see also MHR Capital, 12 NY3d at 646). The parties expressly conditioned their assent to formation of a "valid," "enforceable" and "effective" guarantee contract upon the instrument "be[ing] fully approved and executed by all applicable governmental agencies, including [the Attorney General and Comptroller]" (Guarantee, § 2.2). 
And there was no question in City v State that the Comptroller had, in fact, approved a lease agreement that "included an initial fixed term and the option to continue the occupancy thereafter for so long as the parties mutually desired" (87 NY2d at 985). The only issue was whether the Comptroller's express approval of such an arrangement was effective under State Finance Law § 112 as to an extension term of the lease. Here, in contrast, Downstate at LICH [*13]offers no reason to believe that the Attorney General and Comptroller's approvals of the PSA and Waiver were intended to represent their approval of unsigned draft exhibits annexed thereto, particularly a draft exhibit that contemplated Attorney General and Comptroller review and approval following full execution by the parties (see Guarantee at 6).[FN11]

The Court therefore concludes that an express condition precedent to formation of a guarantee contract, full approval and execution by the Attorney General and Comptroller, did not occur until November 29, 2023. And while the Guarantee makes these approvals retroactive to September 1, 2015, "regardless of when they are obtained" (Guarantee, § 2.2), Fortis purports to have revoked the Guarantee on November 3, 2023, before a binding and enforceable contract ever "[came] into existence" (Adams v Suozzi, 433 F3d 220, 227 [2d Cir 2005]; see Aniero Concrete Co. v New York City Constr. Auth., 1998 WL 148324, *2, 1998 US Dist LEXIS 3938, *7 [SD NY, Mar. 30, 1998, No. 94 Civ 9111 (CSH)], affd sub nom. Aetna Cas. & Sur. Co. v Aniero Concrete Co., 404 F3d 566 [2d Cir 2005]; accord Bedoya, 186 AD3d at 1309). 
Fortis argues that, prior to occurrence of the condition precedent, the Guarantee was a mere offer to contract. From this, Fortis invokes the principle that an offeror may revoke an offer prior to acceptance, unless the offer includes language stating that it is irrevocable (see Petterson v Pattberg, 248 NY 86, 89-90 [1928]; Silber v New York Life Ins. Co., 92 AD3d 436, 440 [1st Dept 2012]; Buchbinder Tunick & Co. v Manhattan Natl. Life Ins. Co., 219 AD2d 463, 466 [1st Dept 1995]; cf. General Obligations Law § 5-1109; Capalongo v Desch, 81 AD2d 689, 690 [3d Dept 1981], affd 57 NY2d 972 [1982]). 
Fortis therefore contends that it was free to revoke its offer to form a contract on the basis of the Guarantee "[a]fter a reasonable time had elapsed and the condition [of Attorney General and Comptroller approval] remained unperformed" (Perna v Desai, 101 AD2d 857, 858 [2d Dept 1984] [citation omitted], affd 63 NY2d 898 [1984]; accord Parker v Booker, 33 AD3d 602, 603 [2d Dept 2006], lv denied 8 NY3d 811 [2007]).
Although Fortis's arguments for dismissal are not without force, the Court concludes that the unpleaded affirmative defense of revocation is not in a posture to be determined as a matter of law on this record. The parties' arguments regarding the Guarantee have evolved significantly since the filing of Downstate at LICH's early motion for summary judgment, which responded to an answer from Fortis that did not plead the failure of a condition precedent or revocation of the Guarantee (see generally Original Answer). 
The focus of the motion practice then shifted to the absence of Attorney General and Comptroller approval, which was first referenced in the VAC, but not pleaded as an affirmative defense. And through its cross motion, Fortis injected a second unpleaded affirmative defense into the mix, revocation, and it now presses an amalgam of the two defenses: that the Guarantee was revoked prior to the occurrence of a condition precedent to contract formation. This argument thus was addressed by Downstate at LICH in its briefing only anticipatorily (see NYSCEF Doc No. 87 at 8-10) and was responded to by Fortis only in a short supplemental filing (see NYSCEF Doc No. 141).
As a result of Fortis's reliance on unpleaded and evolving affirmative defenses, the Court does not believe that the present record adequately addresses the issues raised by the purported [*14]revocation under the particular facts and circumstances of this case,[FN12]
which include: (i) language within the Guarantee describing Fortis's obligations thereunder as "irrevocable . . . under any and all circumstances" (Guarantee, § 1.2); (ii) Fortis's admitted promises in the PSA and Waiver to deliver at the Initial Closing "a duly executed copy of the Fortis Guarantee, substantially in the form attached" to those instruments (PSA, § 2.3; Waiver, § 1 [C]; see ACC, ¶ 88); (iii) the parties' stated intention to give retroactive effect to the Attorney General and Comptroller's approvals, "regardless of when they are obtained" (Guarantee, § 2.2); (iv) the nature of the Guarantee, which was to induce Downstate at LICH's reliance and which did, in fact, induce reliance; and (v) the nature of the unperformed condition, which appears to have been included for the benefit and protection of Downstate at LICH and SUNY.
The Court therefore concludes that Fortis has raised a viable defense to enforcement of the Guarantee, compelling the denial of Downstate at LICH's early motion for summary judgment. However, Fortis has not affirmatively demonstrated its entitlement to judgment on the unpleaded affirmative defense that the Guarantee was validly revoked prior to contract formation, which compels the denial of the branch of Fortis's cross motion predicated thereupon.
B. Vacate in "Good Order"
Fortis further contends that, even if the Guarantee is determined to be a valid and enforceable contract, Cobble Hill was not in default of its obligations under the PSA and Waiver due to the nonoccurrence of a condition precedent to the Final Closing: NYUHC's failure to vacate the Interim Medical Premises in "good order" (see NYSCEF Doc No. 71 at 12-14).
The PSA establishes certain conditions precedent to the Final Closing that must be satisfied or waived (see PSA, § 4.1 [c]). One such condition is that "NYUHC shall have vacated the Interim Medical Premises pursuant to the terms of the Interim Sublease" (id., § 4.2 [e] [vii]). 
Under the Interim Sublease, NYUHC was required to (i) quit and surrender the Interim Medical Premises in "good order, condition and repair, except for ordinary wear and tear" (Interim Sublease, § 1.01 [f] [ii] [F]; 22.01 [b]), (ii) remove all of its property from the demised premises, and (iii) "fully repair any damage" and restore the premises "where such removal results in damage thereto" (id., §§ 12.03 [b]; 22.01 [c]).
To establish the nonoccurrence of the condition precedent that NYUHC "vacated the Interim Medical Premises pursuant to the terms of the Interim Sublease,"[FN13]
Fortis submits the affidavit of a corporate officer annexing photographs of "damage and defects" that "did not exist prior to [NYUHC's] occupancy" (NYSCEF Doc No. 35).
Downstate at LICH responds that Fortis's photographs show only "minor defects . . . consistent with the permitted wear and tear of a working emergency department" (NYSCEF Doc No. 14 at 22). In this regard, Downstate at LICH emphasizes that the Interim Medical Premises comprised almost 33,000 square feet, spanning two buildings, and it argues that "NYUHC substantially complied with its obligation to vacate, even as Fortis construes it" (id. at 23).
The Court concludes that Fortis has raised a triable issue of fact as to whether NYUHC vacated the Interim Medical Premises in accordance with its obligations under the Interim Sublease, so as to satisfy an express condition precedent to the Final Closing. The affidavit of Fortis's representative and annexed photographs provide evidence of damage to the demised premises that was not present at the start of NYUHC's tenancy, and the Court is unable to say that the damage is de minimis or slight simply by examination of Fortis's photographs or even by comparing Fortis's photographs to the competing collection of photographs submitted by NYUHC in support of its motion (see NYSCEF Doc Nos. 125-128; see also Part III [D], infra). 
The Court therefore concludes that the question of whether NYUHC surrendered the Interim Medical Premises "in a condition that conformed to the lease provisions" presents a factual question (Abbott Bros. II Steak Out, Inc. v Tsoulis, 162 AD3d 1472, 1474 [4th Dept 2018]). Neither side has demonstrated its entitlement to summary judgment on this issue.[FN14]

III. NYUHC'S MOTION TO DISMISS
NYUHC moves under CPLR 3211 (a) (1), (5) and (7) to dismiss the counterclaims alleged against it by Fortis and Cobble Hill (see NYSCEF Doc No. 114). These are the counterclaims for: (i) a declaration that NYUHC failed to vacate the Interim Medical Premises in "good order" (Count IV); (ii) breach of contract founded upon the same allegations (Count VIII); (iii) breach of the implied covenant of good faith and fair dealing (Count XI); (iv) tortious interference with the Original PSA (Count XII); and (v) recovery in quasi-contract (Counts XV and XVI).
A. Tortious Interference With Contract
NYUHC argues that the counterclaim for tortious interference with contract is barred by the expiration of the three-year statute of limitations and, in any event, fails as a matter of law because the contract allegedly interfered with by NYUHC, the Original PSA, was superseded and replaced by the amended PSA.
"Tortious interference with contract requires [1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom" (Lama Holding, 88 NY2d at 424; see Ullmannglass v Oneida, Ltd., 86 AD3d 827, 829 [3d Dept 2011]). 
A claim for tortious interference with contract must be brought within three years of the occurrence of the injury (see CPLR 214 [4]; Kronos, Inc. v AVX Corp., 81 NY2d 90, 94 [1993]; Andrew Greenberg, Inc. v Svane, Inc., 36 AD3d 1094, 1099 [3d Dept 2007]). The claim accrues "as soon as [it] becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint. As with other torts in which damage is an essential element, the claim . . . is not enforceable until damages are sustained" (IDT, 12 NY2d at 140-141 [internal quotation marks and citation omitted]; see Kronos, 81 NY2d at 96-97).
Fortis and Cobble Hill do not plead the date of first injury; as observed by NYUHC, the only factual allegation in this regard is a reference to "the expiration of [Fortis and Cobble Hill's] rights under th[e] Original PSA in October 2014" (NYSCEF Doc No. 115 at 10). For their part, Fortis and Cobble Hill acknowledge that NYUHC's "wrongful act (reneging on the agreement as originally contemplated), which resulted in [Downstate at LICH's] breach, occurred in 2014," but they claim to have sustained no "damages until 2023," when Downstate at LICH refused "to make good" on the alleged promise of credits (NYSCEF Doc No. 142 at 8-9). 
The Court concludes that the present record is inconclusive as to the earliest date upon which NYUHC's alleged tortious interference caused Fortis to sustain damages. Although the alleged tortious interference and Fortis and Cobble Hill's loss of rights under the Original PSA [*15]occurred by October 7, 2014, there is no indication that Fortis or Cobble Hill sustained actual damages as of such date (see Kronos, 81 NY2d at 97).
And even if the loss of credits in 2023 could be viewed as the product of NYUHC's alleged interference with the Original PSA — rather than a consequence of Fortis and Cobble Hill's decision to execute the amended PSA in reliance on the informal promise of a State official — the present record does not conclusively establish that 2023 was the earliest date upon which Fortis and Cobble Hill sustained damages from being "cut out . . . from the construction and leasing of the New Medical Building" and required "to buy the property on which the New Medical Building would be constructed" for re-conveyance to NYUHC "for no consideration (rather than lease the property from Fortis at market rates)" (NYSCEF Doc No. 142 at 8; see ACC, ¶¶ 48-59, 95, 175-180).
In any event, even if timely interposed, Fortis and Cobble Hill's claim for tortious interference fails on the merits because the contract that allegedly was breached due to NYUHC's interference, the Original PSA, was superseded by the amended PSA (see PSA, § 26.3 ["For avoidance of doubt, (the Original PSA), and that certain Term Sheet by and among the Parties, dated September 24, 2014, are superseded in full by this Agreement."]).
Where, as here, "the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement" (Northville Indus. Corp. v Fort Neck Oil Terms. Corp., 100 AD2d 865, 867 [2d Dept 1984] [internal quotation marks and citation omitted], affd 64 NY2d 930 [1985]; see Citigifts, Inc. v Pechnik, 67 NY2d 774, 775 [1986]). 
Having assented to the PSA, which extinguished the Original PSA upon becoming effective, Fortis and Cobble Hill are unable to establish an essential element of their claim for tortious interference with contract: that Downstate at LICH breached the Original PSA by reason of NYUHC's interference (see Benjamin v Yeroushalmi, 178 AD3d 650, 653 [2d Dept 2019]; Pate v BNY Mellon-Alcentra Mezzanine III, LP, 163 AD3d 429, 429-430 [1st Dept 2018]; Madey v Carman, 51 AD3d 985, 986 [2d Dept 2008], lv denied 11 NY3d 708 [2008]; cf. Blumenfeld Dev. Group, Ltd v Forest City Ratner Cos., LLC, 50 Misc 3d 1221[A], 2016 NY Slip Op 50188[U], *6-7 [Sup Ct, Nassau County 2016] ["unclear' whether the parties "intended to supersede any and all prior arrangements — contractual or otherwise"]).
Accordingly, Count XII is dismissed.
B. Breach of the Implied Covenant of Good Faith and Fair Dealing
"Within every contract is an implied covenant of good faith and fair dealing," which "is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement" (Aventine Inv. Mgt. v Canadian Imperial Bank of Commerce, 265 AD2d 513, 513-514 [2d Dept 1999] [citations omitted]). To state a cause of action for breach of the implied covenant, "the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff" (id.). 
However, the implied covenant "cannot be used to 'imply obligations inconsistent with other terms of the contractual relationship,' and encompasses only those 'promises which a reasonable person in the position of the promisee would be justified in understanding were included'" (Singh v City of New York, 40 NY3d 138, 146 [2023], quoting 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002]). It "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights" (Fesseha, 305 AD2d at 268; see Integrity Intl., Inc. v HP, Inc., 211 AD3d 1194, 1199 [3d Dept 2022]).
Fortis and Cobble Hill allege that NYUHC breached the implied covenant of good faith and fair dealing contained in "the . . . PSA and Interim Sublease" by: "a. reneging on its lease commitment; b. reneging on the construction by Fortis; [and] c. by failing to acquire the New Medical Site and complete the New Medical Building in a timely manner" (ACC, ¶¶ 170-172).
None of the foregoing obligations appear in the Interim Sublease, which governed the landlord-tenant relationship between Cobble Hill and NYUHC with respect to the Interim Medical Premises. And NYUHC's decision not to lease the New Medical Site or hire Fortis to construct the New Medical Building did not deprive Cobble Hill of the benefits of the Interim Sublease, either in terms of the consideration received (see Interim Sublease, § 2.2 [rent]) or the non-monetary benefits of ensuring the continued provision of medical services in the Interim Medical Premises until the New Medical Building could be built and placed in operation (see id., Statement of Facts at 3). Indeed, in their opposition, Fortis and Cobble Hill cite no provision of the Interim Sublease that reasonably encompasses the implied obligations sued upon (see NYSCEF Doc No. 142 at 14; Tompkins Fin. Corp. v John M. Floyd & Assoc., Inc., 144 AD3d 1252, 1257 [3d Dept 2016]).
This leaves the PSA. Fortis and Cobble Hill first allege an implied obligation by NYUHC to rent the New Medical Site from Cobble Hill. But the PSA calls for Downstate at LICH to transfer ownership of the New Medical Site directly to NYUHC for no additional consideration (see PSA, § 1.3 [a]). Given this language, implying an obligation on the part of NYUHC to lease the New Medical Site from Cobble Hill would be fundamentally inconsistent with the text of the PSA and the structure of the transaction described therein.
Fortis and Cobble Hill also seek to imply an obligation by NYUHC to hire Fortis to construct the New Medical Building. As is pertinent here, the PSA provides only that NYUHC shall "at its sole cost and expense . . . substantially complete the New Medical Building" (id., § 10.6). Nothing in that language suggests or implies that NYUHC was obliged to select Fortis as the contractor,[FN15]
and the Court declines to imply the creation of independent contractual rights.
The third alleged breach is NYUHC's failure to timely acquire the New Medical Site and complete the New Medical Building. As alleged by Fortis and Cobble Hill, the PSA contemplated Downstate at LICH's conveyance of the New Medical Site to NYUHC in or around 2016 (see ACC, ¶¶ 83, 87). However, the New Medical Site was not conveyed "until 2020, despite the fact that Fortis paid for it in 2015" (id., ¶ 83), and construction of the New Medical Building was not completed until 2023 (see id., ¶ 87). 
Although the PSA allows for the extension of deadlines, Fortis alleges that NYUHC's delays were manufactured to allow it the benefits of operating an emergency department in the Interim Medical Premises for eight years at Fortis and Cobble Hill's expense (see id., ¶¶ 68-69, 87). Fortis and Cobble Hill further allege that NYUHC's manufactured delays prevented "complet[ion of] the construction of [Fortis's] residential tower and, as a result [, Fortis] incurred carrying costs exceeding $12.1 million, and ultimately lost $50 million of equity when it was forced to convey three parcels to its lender" (id., ¶ 173; see also id., ¶ 93).
The Court is satisfied that Fortis and Cobble Hill have stated a claim against NYUHC under the implied covenant of good faith and fair dealing through allegations of manufactured delays undertaken in bad faith for NYUHC's own financial benefit, even if those delays did not contravene the express terms of the PSA or Waiver. 
NYUHC further argues that the claim for breach of the implied covenant is barred by expiration of the six-year statute of limitations, which accrued at the time of the alleged breach(es) (see P.S. Fin., LLC v Eureka Woodworks, Inc., 214 AD3d 1, 29 [2d Dept 2023]; Aozora Bank, Ltd. v Credit Suisse Group, 144 AD3d 437, 440 [1st Dept 2016]).
Fortis and Cobble Hill acknowledge that NYUHC's alleged delays began on or about June 30, 2016, the date by which it should have acquired the New Medical Site (see ACC, ¶ 87). However, they argue that the delay claim is subject to the continuous-wrong doctrine, which extends the statute of limitations "when the contract imposes a continuing duty on the breaching [*16]party" (Henry v Bank of Am., 147 AD3d 599, 601 [1st Dept 2017]). 
NYUHC argues that the PSA does "not create a continuing duty subject to repeated breaches over a period of time" (NYSCEF Doc No. 143 at 7; cf. Garron v Bristol House, Inc., 162 AD3d 857, 859 [2d Dept 2018] [ongoing duty to "keep the building in good repair and to provide habitable premises"]; 1050 Tenants Corp. v Lapidus, 289 AD2d 145, 146 [1st Dept 2001] [ongoing "obligation to avoid any conduct that interferes with other lessees' rights, and to comply with all applicable laws and regulations"]). According to NYUHC, Fortis and Coble Hill are asserting "a single breach — with damages increasing as the breach continues" (Henry, 147 AD3d at 601-602). 
The Court concludes that NYUHC has failed to establish its statute of limitations defense as a matter of law on this record. The PSA and Waiver imposed duties upon NYUHC to acquire the New Medical Site and construct the New Medical Building, and NYUHC has not affirmatively demonstrated that these obligations were not of a continuing nature. In other words, NYUHC has not shown that (i) its delay in acquiring the New Medical Site by June 30, 2016 "discharge[d] its obligation of future performance" relative to the acquisition of the site and construction of the New Medical Building (NYSCEF Doc No. 143 at 6), or (ii) the damages sought by Fortis and Cobble Hill are "merely a consequence" or "continuing effect[] of earlier conduct alleged to have been wrongful" (Carey v Trustees of Columbia Univ. in City of New York, 177 AD3d 452, 452 [1st Dept 2019], lv denied 35 NY3d 905 [2020]).[FN16]

As such, the branch of NYUHC's motion seeking dismissal of Count XI is denied, but the counterclaim shall be limited in accordance with the foregoing.
C. Quasi-Contractual Claims (Quantum Meruit/Unjust Enrichment)
"A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all" (Clark-Fitzpatrick, 70 NY2d at 388 [citations omitted]). "Accordingly, a party cannot recover damages [in quasi contract] based on conduct or events governed by a written agreement" (Tompkins Fin. Corp., 144 AD3d at 1256 [citation omitted]).
Fortis and Cobble Hill oppose dismissal of their quasi-contractual counterclaims on the ground that "there is a dispute as to what the scope of the actual contract between the parties is" (NYSCEF Doc No. 142 at 18). But even assuming that to be the case, the conduct on the part of NYUHC giving rise to the claimed quasi-contractual obligations — "Fortis's donating land to [NYUHC], paying for demolition required for construction of [NYUHC's] New Medical Building, and paying for hospital building operating expenses from 2015 until 2023 while [NYUHC] operated its hospital facilities in the old building" (id. at 16; see ACC, ¶¶ 195-197, 203) — are subjects comprehensively governed by the PSA, Interim Sublease and other written agreements between and among the parties (see PSA, §§ 1.3 [a], 10.5 [a], 15.1; Interim Sublease, §§ 2.02, 2.06, 13.02).
Accordingly, the quasi-contractual counterclaims must be dismissed as against NYUHC.
D. Breach of the Interim Sublease
The remaining counterclaims against NYUHC, Counts IV and VIII, are based on the allegation that NYUHC breached the Interim Sublease by failing to vacate the Interim Medical Premises '"in good order, condition and repair, except for ordinary wear and tear'" (ACC, ¶¶ 129, 154-156). 
In moving for dismissal, NYUHC invites the Court to compare Fortis's photographs with its competing collection (see NYSCEF Doc Nos. 125-128) "to evaluate the state in which [it] left [the] premises" (NYSCEF Doc No. 115 at 17). NYUHC contends that this examination will show that the demised premises were, in fact, left with "nothing more than ordinary wear and tear" (id. at 17-18).
This is not, however, a motion for summary judgment following joinder of issue. NYUHC moves for pre-answer dismissal under CPLR 3211 (a) (1), a motion that "'will be granted only if the documentary evidence resolves all factual issues as a matter of law, and conclusively disposes of the [subject] claim'" (Carr v Wegmans Food Mkts., Inc., 182 AD3d 667, 668 [3d Dept 2020], quoting Fontanetta v John Doe 1, 73 AD3d 78, 83-84 [3d Dept 2010]). "What may be deemed 'documentary evidence' for purposes of this subsection is quite limited. 'Materials that clearly qualify as documentary evidence include documents . . . such as mortgages, deed[s], contracts, and any other papers, the contents of which are essentially undeniable'" (id., quoting Koziatek v SJB Dev. Inc., 172 AD3d 1486, 1487 [3d Dept 2019]). 
Competing affidavits and photographs, the authenticity and relevance of which are in dispute to some degree (see NYSCEF Doc No. 125, ¶¶ 5-9), are not within the purview of CPLR 3211 (a) (1) (see Carr, 182 AD3d at 668; accord J.D. v Archdiocese of NY, 214 AD3d 561, 561 [1st Dept 2023]; Davis v Henry, 212 AD3d 597, 598 [2d Dept 2023]).[FN17]
And, in any event, the Court concludes for the reasons stated in Part II (B), supra, that NYUHC's evidence does not utterly refute Fortis and Cobble Hill's allegations of breach.
NYUHC therefore has not established its entitlement to dismissal of Counts IV and VIII.
CONCLUSION
Based on the foregoing,[FN18]
it is
ORDERED that Downstate at LICH's motion to dismiss the counterclaims alleged against it by Fortis and/or Coble Hill is granted to the extent of dismissing all such counterclaims, except for Counts I and III; and it is further
ORDERED that the Notice of Pendency (see NYSCEF Doc No. 36) is vacated; and it is further
ORDERED that Downstate at LICH's motion for summary judgment is denied; and it is further
ORDERED that Fortis's cross motion for summary judgment is denied; and it is further
ORDERED that Fortis's motion to further amend its answer is granted, and the Proposed Second Amended Verified Answer and Counterclaims (see NYSCEF Doc No. 107) is accepted as filed, subject to the dispositions ordered herein; and it is further
ORDERED that NYUHC's pre-answer motion to dismiss the counterclaims alleged against it by Fortis and/or Cobble Hill is granted to the extent of dismissing Counts XII, XV and [*17]XVI as against NYUHC and limiting Count XI in accordance with Part III (B), supra, and the motion is otherwise denied; and it is further
ORDERED that Downstate at LICH and NYUHC shall answer the counterclaims, as limited herein, within twenty (20) days from the date of this disposition; and finally it is
ORDERED that a remote preliminary conference shall be scheduled, and the parties shall confer in advance of such conference as to (1) their willingness to proceed to early mediation or other form of alternative dispute resolution, and (2) a schedule for the expeditious completion of any necessary discovery. 
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for Fortis and Cobble Hill shall promptly serve notice of entry on all parties entitled to such notice.
Albany, New York
Dated: April 5, 2024
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1-11, 13-60, 63, 68-80, 87-101, 103-111, 114-129, 132-143, 147.

Footnotes

Footnote 1: As discussed at oral argument, Fortis and Cobble Hill inexplicably refer to Downstate at LICH by the defined term "SUNY" in all of their pleadings and motion papers (see e.g. VAC at 7), leaving it unclear at times which factual allegations are directed at plaintiff Downstate at LICH versus nonparty SUNY (see generally NYSCEF Doc No. 147 at 7-11).

Footnote 2: The parties also executed a First Amendment to the PSA in September 2015 (see NYSCEF Doc No. 23), which is not at issue herein.

Footnote 3: The $96 million consists of the value of the land donated to NYUHC ($58 million), operating expenses for the interim emergency department ($14.2 million), demolition of the NYUHC site ($11.6 million) and expenses and losses associated with the delay in constructing Two River Park ($12.1 million) (see id., ¶¶ 94-98).

Footnote 4: The VAC also added Cobble Hill as a counterclaim plaintiff to certain causes of action and pleaded new causes of action for (i) a declaration that the Guarantee is invalid or unenforceable and (ii) return of the down payments made to Downstate at LICH. The amended pleading further alleges that the commitments for additional credits "were made both orally and in writing" (ACC, ¶ 64), but limited the source of those alleged commitments to James Malatras alone (compare Original Answer, Counterclaims, ¶ 66, with VAC, ACC, ¶ 70; see also ACC, ¶¶ 61-66).

Footnote 5: Cobble Hill also disclaimed reliance on any representations or warranties "with respect to the Property" to be conveyed to it, "including, without limitation," representations or warranties with respect to 14 prescribed subjects (id., § 9.2 [a-n]).
Footnote 6: As observed by Downstate at LICH, the PSA did not need to specifically "disclaim any representations with respect to a purported secret oral agreement to give [Cobble Hill] a hundred million dollars [in] credits" to put the counterclaim plaintiffs on notice of its intended effect (Transcript at 30).

Footnote 7: The foregoing averments are echoed in the affidavit of Fortis's chief financial officer, based on a conversation he had with the Kestenbaums following their meeting with Malatras (see NYSCEF Doc No. 76, ¶ 7).
Footnote 8: Fortis believes the letter will be produced in discovery (see NYSCEF Doc No. 71 at 4).

Footnote 9: The third argument, which seeks to justify Cobble Hill's failure to close upon Downstate at LICH's refusal to provide additional credits, is rejected for the reasons stated in Part I (A), supra.

Footnote 10: In its motion for summary judgment, Downstate at LICH also argued that consideration of Fortis's defenses based on the condition precedent is precluded by (i) Fortis's failure to plead the nonoccurrence of the condition in its answer, and (ii) an alleged admission as to the effectiveness of the Guarantee in Fortis's answer (see NYSCEF Doc No. 87 at 3-6). However, Downstate at LICH abandoned these arguments (see Transcript at 47).

Footnote 11: There is nothing on the face of the approved Guarantee (see NYSCEF Doc No. 136) that indicates or suggests any type of prior review or approval. There is an email from an Assistant Attorney General indicating that the Guarantee was received by OAG on November 17, 2023 and approved as to form on November 20, 2023 (see id. at 8). And OSC simply affixed a stamp indicating that the Guarantee was approved by the Comptroller on November 29, 2023 (see id. at 6).

Footnote 12: Additionally, Fortis's characterization of the Guarantee as an "offer" prior to satisfaction of the condition precedent warrants some further consideration.

Footnote 13: Relying on a dictionary definition of the word "vacate," Downstate at LICH argues that NYUHC's only obligation was to leave the Interim Medical Premises at the end of the Interim Sublease (see NYSCEF Doc No. 14 at 18-19). However, this argument fails to give effect to the language that follows — that "NYUHC shall have vacated the Interim Medical Premises pursuant to the terms of the Interim Sublease" (emphasis added) (see Elmira Teachers' Assn. v Elmira City School Dist., 53 AD3d 757, 759 [3d Dept 2008] ["a contract should be interpreted according to its plain and ordinary meaning and in such a manner as to give effect to all of its provisions" (citations omitted)], lv denied 11 NY3d 709 [2008]).

Footnote 14: In light of this conclusion, the branch of Downstate at LICH's motion seeking the dismissal of Count III is denied.

Footnote 15: It bears emphasis that the Original PSA tasked Cobble Hill with the obligation of constructing the New Medical Building (see Original PSA, § 15.1 [b]).

Footnote 16: Where "a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously and plaintiffs may assert claims for damages occurring up to six years prior to filing of the suit" (Airco Alloys Div. v Niagara Mohawk Power Corp., 76 AD2d 68, 80 [4th Dept 1980]). However, "so much of the causes of action asserted by [plaintiffs] as accrued more than six years prior to . . . commencement . . . must be dismissed as time-barred" (Westchester County Correction Officers Benevolent Assn., Inc. v County of Westchester, 65 AD3d 1226, 1228 [2d Dept 2009]). Relatedly, this Court routinely takes judicial notice of the COVID-19 toll, which suspended the running of the statute of limitations for 228 days from March 20, 2020 until November 3, 2020 (see Ruiz v Sanchez, 219 AD3d 1363, 1363-1364 [2d Dept 2023]; Matter of Roach v Cornell Univ., 207 AD3d 931, 932-933 [3d Dept 2022]).

Footnote 17: Nor would such proof be appropriate under CPLR 3211 (a) (7) (see Pioneer Bank v Teal, Becker & Chiaramonte, CPAs, P.C., 77 Misc 3d 360, 363-366 [Sup Ct, Albany County 2022]).
Footnote 18: To the extent not specifically addressed, the parties' remaining arguments and contentions have been considered and found to be either without merit or unnecessary to entertain based on the disposition reached herein.